**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RAZOR TECHNOLOGY, LLC** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 18-654** |
| | : | |
| **TODD HENDRICKSON,** *et al.* | : | |

**KEARNEY, J.**                                                                                     **May 3, 2018**

**MEMORANDUM WITH**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

We appreciate the years of hard work and investment necessary to succeed in selling cutting edge information technology to cautious corporate buyers. Companies selling hardware, software and end-to-end solutions may create a sales or accounting formula which could possibly become its confidential trade secret. The sales representative can also employ his sales techniques and knowledge of the customers' preferences without stealing his former employer's trade secrets unless the former employer can show evidence its knowledge of the customers' preferences is a trade secret. In addition to protecting trade secrets, sales companies wanting to protect their client base often require incoming sales representatives agree not to compete after leaving. Absent definitive agreed terms restricting post-employment conduct, the sales representative can seek the same customer business for a competing new employer.

In the accompanying Order, we deny an information technology employer's motion to enjoin its former sales representative's successful efforts with one of the former employer's customers as the former employer did not adduce evidence of definitive post-employment restrictions or the former employee is improperly using trade secrets. Under Rule 52, and after evaluating credibility of witness testimony at our April 30, 2018 hearing on Plaintiff's Motion

for a preliminary injunction (ECF Doc. No. 24), we today enter findings of facts and conclusions of law supporting our accompanying Order.

## I.     Findings of fact

1.     After graduating from the University of Delaware, Todd Hendrickson began working as a sales representative for value-added resellers in the Information Technology ("IT") hardware and software industry.

2.     Value-added resellers connect end-user customers (e.g., banks, securities firms) with software and hardware manufacturers to meet the customer's IT needs.  The manufacturers pay a commission to the value-added resellers.

3.     Mr. Hendrickson worked for Atrion, a value-added reseller, from 2000 until January 2012.  At Atrion, Mr. Hendrickson primarily sold Hewlett-Packard products.  Mr. Hendrickson wanted to move a value-added reseller partnered with more manufacturers and larger number of products sold.

4.     Razor Technologies, LLC, founded in 2004 by George Sucher and James Stillittano, competes with Atrion in selling software and hardware. Razor  claims it offers more than Atrion by providing "full service, end-to-end, IT cloud infrastructure services company with capabilities to meet all of its customer IT needs, including architecture, integration, deployment and managed services."[1]

5.     Razor contacted Mr. Hendrickson about joining Razor in 2009 and again in 2011. The 2009 discussions did not progress but began again in later 2011.

6.     Messrs. Sucher and Stillittano testified during their 2011 pre-employment discussions with Mr. Hendrickson, Mr. Hendrickson stated he had a non-compete agreement with Atrion.

7.      Mr. Hendrickson testified he did not have a non-compete agreement at Atrion because the owner did not believe in them.

8.      Neither party produced a copy of a non-compete agreement between Atrion and Mr. Hendrickson.  We heard no testimony from Atrion.

9.      Mr. Stillittano testified he and Mr. Hendrickson "generally" discussed Razor requiring a non-compete agreement with Mr. Hendrickson and may have mentioned a two year restriction but he could not be sure.

10.     Mr. Sucher testified he and Mr. Hendrickson discussed the client accounts Razor would assign him because Mr. Hendrickson had a two-year non-compete agreement with Atriano and could not bring clients with him to Razor.

11.     On January 9, 2012, Razor extended an offer letter to Mr. Hendrickson to begin work as a Senior Enterprise Account Executive on January.  Razor's offer letter does not mention a non-compete agreement.[2]

12.     On January 17-19, 2012, before agreeing to join Razor, Mr. Hendrickson attended Razor's sales kickoff meeting in Atlantic City with Razor's co-founding member Mr. Sucher.

13.     During the sales kickoff, a human resources power point presentation mentioned Razor's use of non-compete agreements.  After seeing this slide, Mr. Hendrickson told Mr. Sucher he would not agree to a non-compete agreement with Razor.  Hendrickson testified Mr. Sucher did not reply, just looked at Mr. Hendrickson.  Mr. Hendrickson testified he took this to mean Mr. Sucher and Razor understood his position he would not sign a non-compete agreement.  Mr. Hendrickson testified he earlier told Razor he did not have a non-compete with Atrion and would not sign one now.

14.     Mr. Sucher disputed this account and testified Mr. Hendrickson never said he would not sign a non-compete agreement at the sales kickoff.

15.     On January 19, 2012, Mr. Hendrickson signed Razor's offer letter which did not mention post-employment restrictions.

16.     On January 30, 2012, the Razor receptionist presented Mr. Hendrickson his new hire paperwork including a non-compete agreement.  The document is formally called a Confidentiality Agreement but all witnesses referred to it as a "non-compete."

17.     Razor's non-compete agreement prohibits former employees from engaging in business competitive to Razor for 2 years in Pennsylvania, New Jersey, New York, and Massachusetts and "related Razor Technology customer regions."[3]

18.     Mr. Hendrickson testified he was slightly surprised to see the non-compete agreement included in his new hire paperwork but assumed the receptionist just handed him the standard paperwork and unaware of his refusal to sign the non-compete.

19.     Mr. Hendrickson testified he did not sign the non-compete agreement.  Instead, Mr. Hendrickson kept it in his bag for a few weeks.  He recalled it began to get crinkled and he eventually threw it out.

20.     Almost six weeks later, on March 12, 2012, Mr. Hendrickson signed the acknowledgement he received with Razor's employee handbook.  The handbook stated "In order to protect the company from unauthorized release of [confidential information], all salaried employees will be required to sign [non-compete agreement].  This agreement will be a condition of employment and continued employment."[4]

21.     In an affidavit filed before our hearing, Mr. Sucher swore he "firmly believed (and still believes[s])" Mr. Hendrickson signed the Confidentiality Agreement.[5]

22.     At the hearing, Mr. Sucher changed his story and testified he recalled seeing Mr. Hendrickson's signature on the non-compete agreement when the receptionist brought him Mr. Hendrickson's completed paperwork right after he started.  Mr. Sucher did not recall whether Mr. Hendrickson's signed acknowledgement of receiving the handbook or other paperwork was also in the file because he did not look that closely.

23.     At the time, Razor maintained Mr. Hendrickson's personnel file and all personnel files in hard copy.

24.     In January 2013, Razor presented Mr. Hendrickson with a 2013 Compensation Plan Terms & Conditions and Mr. Hendrickson signed the document.

25.     The 2013 Compensation Plan provides "This is not an employment contract; rather, it is a description of terms, policies, and procedures associated with your incentive payment.  Razor Technology, LLC may modify or amend this plan at any time at its sole discretion."[6]

26.     Mr. Sucher testified the 2013 Compensation Plan states it is not an employment contract because he believes Pennsylvania is right-to-work state and employment contracts are banned but he believes it binds Mr. Hendrickson to the non-compete language.

27.     The 2013 Compensation Plan provided, "By accepting any pay under the Compensation Plan, you are automatically accepting the Plan, agreeing to a full non-compete in your general territory and Razor Technology, LLC territory and agreeing that your compensation shall be determined in accordance with the provisions of this Plan, as it is currently constituted and as it may be changed from time to time by Razor…"[7]

28.     Mr. Sucher testified the 2013 Compensation Plan increased Mr. Hendrickson's commission rate increased for one area of sales and Razor added a new item of sales for Mr. Hendrickson.

29.     In March 2013, Razor hired Chris McGrath to handle its human resources, first as the Controller and then as Chief Financial Officer.

30.     Mr. Sucher testified Razor brought Mr. McGrath on to "sure up" the offer letter and non-compete agreements because "a couple slipped through cracks." Mr. McGrath changed Razor's offer letters to include a non-compete and a handbook acknowledgement as part of accepting employment.

31.     One of Mr. McGrath's first projects was to convert the employees' personnel files from hardcopy to digitized versions. Razor no longer created hard copy files for new employees and moved the hard copy files for existing employees to a safe in Mr. Stillittano's office.

32.     In the first quarter 2014, Mr. McGrath directed his assistant Amber Young to audit the employees' personnel files for required documents including the non-compete agreement.

33.     Ms. Young created an audit sheet marking whether each employee had returned certain employment papers. One column is named "non-compete." The box for "non-compete agreement" for Mr. Hendrickson's file is checked. Mr. McGrath could not testify to why Ms. Young placed the check in the box. Mr. McGrath was "sure" Ms. Young reviewed Mr. Hendrickson's electronic personnel file, not the hard copy version.

34.     The next year, Razor presented Mr. Hendrickson with the 2014 Compensation Plan which similarly stated it is not an employment contract and also had non-compete language. Razor also reserved the right to modify the terms of the agreement at any time.

35.     The 2014 Compensation Plan increased Mr. Hendrickson's commission pay in two sales areas.

36.     Mr. Hendrickson did not sign the 2014 Compensation Plan but accepted payments from Razor under the Plan.

37.     Mr. McGrath continued to direct a yearly audit of employees' personnel files and the check for Mr. Hendrickson's non-compete remained until he resigned in August 2017.

38.     After Razor suspected Mr. Hendrickson allegedly violated the non-compete agreement it believed he signed, Mr. McGrath searched Mr. Hendrickson's personnel files.

39.     In Mr. Hendrickson's electronic personnel file, Mr. McGrath discovered a signed non-compete agreement but the agreement is between Razor and a former employee Mr. Kurik.

40.     Mr. McGrath could not locate a non-compete agreement between Mr. Hendrickson and Razor.

41.     Mr. McGrath researched the personnel file's electronic history and discovered Mr. Kurik's non-compete agreement and handbook acknowledgement were digitally placed in Mr. Hendrickson's file on May 26, 2015.  No party explains how it got there.  Mr. Hendrickson denies his access to either the hard files or digitized copies and there is no contrary evidence.

42.     In Mr. Hendrickson's hardcopy personnel file, Mr. McGrath did not find a signed non-compete agreement between Mr. Hendrickson and Razor.

***Razor and Mr. Hendrickson's relationship with TD Ameritrade.***

43.     While at Razor, Mr. Hendrickson acquired Goldman Sachs as a client through his college fraternity friend Tom Scarpati who worked in information technology there.

44.     In Fall 2015, Mr. Scarpati moved from Goldman Sachs to TD Ameritrade.

45.     Mr. Scarpati provided Mr. Hendrickson with "warm introductions" to TD Ameritrade IT employees for Mr. Hendrickson to try and compete for various portions of TD Ameritrade's IT needs.

46.     TD Ameritrade data storage team leader Bernie Castronovo hired Mr. Hendrickson and Razor for a project. TD Ameritrade server team leader Chibo Qian also hired Mr. Hendrickson and Razor for a project.

47.     While working with these teams, Mr. Hendrickson learned TD Ameritrade needed assistance updating an existing virtual desktop infrastructure ("VDI"), which is a system allowing TD Ameritrade employees to remotely access their work desktop computers.

48.     Mr. Hendrickson asked Razor to hire Steve Wright to assist in selling TD Ameritrade VDI implementation because he had specialized knowledge in VDI technology.

49.     Along with Mr. Wright, Mr. Hendrickson made a sales pitch to TD Ameritrade to assist with their VDI implementation and TD Ameritrade asked him to coordinate its "proof of concept" for the VDI implementation.

50.     TD Ameritrade created documents with its VDI requirements and selected three possible software manufacturers, Pivot3, VXrail, and Nutanix, to review its VDI requirements and prepare a software and hardware configuration to meet those requirements.

51.     TD Ameritrade provided the requirements documents to the three possible software managers.

52.     The three software manufacturers with hardware manufacturer Lenovo prepared proofs of concept to meet TD Ameritrade's VDI requirements and TD Ameritrade reviewed their work.

53.     Razor played a limited role in this bidding process. It hoped to be the facilitator between TD Ameritrade and the manufacturers about pricing, and coordinating the manufacturers when they tested their proofs of concept on TD Ameritrade's systems. Razor had no input on TD Ameritrade's VDI requirements, work on any software or hardware designs, or have a role in which manufacturers TD Ameritrade selected for the VDI implementation.

54.     Razor hoped, as the middle man, the manufacturers would pay it a commission on the sales of VDI products.

55.     TD Ameritrade selected Nutanix as its software manufacturer with Lenovo as the hardware manufacturer for the VDI implementation. The winning hardware/software product is called "nodes."

56.     In this process, Razor ultimately sells Nutanix/Lenovo's VDI nodes to TD Ameritrade meaning the purchase agreements are between Razor and TD Ameritrade.

57.     Razor makes its profit after TD Ameritrade and the software/hardware manufacturers agreed to a price and then the manufacturers and Razor agreed to Razor's profit margin on the sale.

58.     Razor and TD Ameritrade signed purchase agreements in February, April, and July 2017 for varied pieces of the VDI implementation.

59.     During the course of Razor and TD Ameritrade's relationship, Mr. Hendrickson and Razor learned TD Ameritrade's specifications as to its invoices, statements of work, and preferred shipping methods and had its employees conform to TD Ameritrade's specifications to ensure a continued relationship.

60.     Mr. Sucher testified it took many tries to get this "process perfect."

61.     Specifically, Razor learned TD Ameritrade required the purchase order number to be on invoices, the quotes to be on an Excel spreadsheet instead of PDF, and knew the proper shipping logistics and TD Ameritrade personnel to contact for deliveries.

***Mr. Hendrickson leaves Razor to obtain an ownership stake in CE Tech.***

62.     While employed with Razor, Mr. Hendrickson socially met Tim Dwyer who worked in IT sales.  From time to time, they discussed the possibility of working together.

63.     In April 2017, Tim Dwyer formed CE Tech, LLC.

64.     In Spring 2017, Mr. Hendrickson and Mr. Dwyer discussed Mr. Hendrickson joining CE Tech with an ownership interest.

65.     On August 11, 2017, Mr. Hendrickson resigned from Razor.

66.     Razor's manager Jim Stillittano met with Mr. Hendrickson attempting to convince him to remain with Razor.  At the meeting, Mr. Hendrickson told Mr. Stillittano he would be competing with Razor.

67.     Mr. Stillittano testified Mr. Hendrickson told him he would work with emerging technologies and he never expected Mr. Hendrickson would be looking for purchases on TD Ameritrade's VDI project.

68.     Another Razor employee Tony Gatea testified he spoke with Mr. Hendrickson to encourage him not to resign and Mr. Hendrickson stated he knew Razor's "swim lane" and he needed to find his own.  Mr. Gatea replaced Mr. Hendrickson as Razor's representative on the TD Ameritrade account.

69.      Razor never requested Mr. Hendrickson return documents, information, or ask to review his personal computer after his resignation.

70.     Mr. Hendrickson then joined CE Tech.

71.     Razor refused to disable Mr. Hendrickson's access to his Razor email until September 2017 and throughout August and September, Razor employees communicated with Mr. Hendrickson on his Razor e-mail account.

72.     Razor fulfilled a TD Ameritrade order for VDI product in September 2017.

73.     Razor's registration with Lenovo for VDI nodes expired before September 2017.

74.     Razor's cavalier attentiveness to TD Ameritrade after Mr. Hendrickson's departure raises several questions as to whether it expected to ever get another TD Ameritrade order.   For example, Lenovo's Cara Orton testified Mr. Gaeta, Mr. Hendrickson's replacement at Razor, did not contact Ms. Orton about new business opportunities, including further VDI sales, with TD Ameritrade from August 22, 2017 until November 29, 2017.[8]

75.     Ms. Orton testified the only Razor employee she spoke with for these ninety days was a "Kevin" about order status for already existing deals.[9]

76.     In October 2017, Mr. Hendrickson and CE Tech learned TD Ameritrade needed to purchase additional VDI products.

77.     To seek TD Ameritrade's October 2017 VDI sale, CE Tech submitted a "registration request" to Lenovo to become its approved reseller partner.

78.     Mr. Hendrickson, on behalf of CE Tech, reached out to Mr. Qian at TD Ameritrade to secure the October 2017 sale of additional VDI products.

79.     On October 3, 2017, Lenovo's Cara Orton e-mailed Mr. Hendrickson a list with the quantity, price, and configurations for the October 2017 TD Ameritrade's VDI sale.  Ms. Orton testified while the information is in Razor quote format, the underlying data came from Lenovo, not Razor.[10]

80. Mr. Hendrickson did not ask Ms. Orton to send him Razor's quote documents.

81. Mr. Hendrickson used the quotes from Ms. Orton to quickly create CE Tech's bid to facilitate the October 2017 VDI sale.

82. On October 4, 2017, Mr. Qian initially denied Mr. Hendrickson's sales pitch but changed his mind the next day and decided to give Mr. Hendrickson and CE Tech another look at the October 2017 VDI sale.

83. On October 6, 2017, Mr. Hendrickson learned TD Ameritrade selected CE Tech for the October 2017 VDI sale.

84. Steven Patterson, managing director of TD Ameritrade's product infrastructure group, testified TD Ameritrade selected CE Tech for the October 2017 VDI sale because everyone there felt "comfortable" with Mr. Hendrickson because he met with the VDI teams "frequently" and "made himself available."[11]

85. Mr. Patterson testified Mr. Qian felt this is "not true" of Mr. Hendrickson's replacement at Razor, Mr. Gatea. Mr. Qian and his team did not meet with Mr. Gaeta until after CE Tech secured the October 2017 VDI sale from TD Ameritrade.[12]

86. Mr. Patterson testified from when Mr. Hendrickson resigned from Razor until the date of his deposition, he met with Mr. Gaeta a total of three times.

87. Mr. Patterson also testified Razor still does "get some business" from TD Ameritrade.[13] Mr. Gaeta confirmed the ongoing but limited relationship as well.

88. On October 19, 2017, Ms. Orton again emailed Mr. Hendrickson with quantity, price, and configurations for the October 2017 TD Ameritrade's VDI sale in the format of a Razor quote.[14]

89. Mr. Hendrickson did not ask Ms. Orton to send him this Razor quote.[15]

90. TD Ameritrade began purchasing millions of dollars of equipment for the VDI project through Mr. Hendrickson and CE Tech. Mr. Hendrickson admitted TD Ameritrade has purchased $42 Million of VDI product sales through CE Tech since October 2017. The commission for these sales varies, but is approximately 10%.

91. Mr. Sucher testified Razor suffered damage and continues suffer damage to its relationship with TD Ameritrade because Mr. Hendrickson and CE Tech are securing business from TD Ameritrade which would otherwise have gone to Razor.

92. Almost four months after CE Tech secured its first TD Ameritrade sale, Razor sued Mr. Hendrickson and CE Tech. Razor accurately described the problem in the first paragraph of its complaint: "In the highly competitive Information Technology ("IT") field, businesses routinely invest enormous time and money to develop and protect the confidential and proprietary business processes and other trade secrets that set them apart from their competition. Unauthorized use and/or disclosure of such information can devastate an IT company, sometimes even jeopardizing its continued existence. Therefore, when a rogue former employee disregards his confidentiality and non-competition obligations and utilizes the confidential information he acquired during employment for his own benefit and at the significant expense of his former employer, equity cries out for a remedy…"[16] All true. Now Razor is put to its proof to obtain injunctive relief.

93. After we granted expedited discovery, we held an extensive hearing to determine whether to preliminarily enjoin: (1) Mr. Hendrickson and CE Tech from doing business with Razor's existing customers "in connection with products and/or services that Razor supplied on or before" Mr. Hendrickson's resignation; (2) enjoin Mr. Hendrickson and CE Tech from using or disclosing Razor's trade secrets; and, (3) seeking or accepting employment or providing

services to an employer engaged in business similar or the same as Razor.[17]  Razor also seeks us

to order Mr. Hendrickson to return documents, software, materials and any work product related

to his employment with Razor back to Razor.[18]

94.     On April 30, 2018, we heard testimony and evaluated the credibility of George

Sucher, Chris McGrath, Todd Hendrickson, Jay Gagne, Tony Gaeta, and James Stillittano.  We

admitted several exhibits and agreed to the admission of the deposition testimony from

unavailable witnesses Cara Orton and Steven Patterson.

95.     We face he said-she said conflicts in deciding whether Mr. Hendrickson agreed to

post-employment restrictions.  We must carefully evaluate witness credibility.   After evaluating

the testimony of many witnesses in light of admitted exhibits, we find Razor's witnesses,

particularly its founders, cannot credibly establish Mr. Hendrickson agreed to post-employment

restrictions.  Razor does not have a signed agreement, cannot show Mr. Hendrickson ever agreed

to post-employment restrictions and its vague and changing explanations for not having a signed

agreement are difficult to credit at this stage.  Both founders changed sworn testimony before us

on whether Razor has a signed agreement and whether Mr. Hendrickson otherwise agreed to

definitive terms.  Conversely, Mr. Hendrickson's detailed description of telling Mr. Sucher he

would not sign a non-compete at the January 2012 Atlantic City sales kick-off, placing a later

provided copy of a non-compete in his bag and never signing the agreement or agreeing to terms

is credible on the present record.

96.     Issues concerning whether Razor's knowledge of TD Ameritrade's preferences

constitute a trade secret also rely, although to a lesser extent, on determining credibility of

witnesses.  Razor did not adduce evidence of a propriety formula or sales technique being used

by Mr. Hendrickson or CE Tech which is not otherwise known, if not created, by TD

Ameritrade. The testimony is largely undisputed as to Razor's inattentiveness to TD Ameritrade VDI project after Mr. Hendrickson resigned. This conduct speaks volumes. Razor also did not adduce evidence of anything special in knowing how TD Ameritrade preferred to be billed. We heard no evidence supporting Razor from TD Ameritrade. To the contrary, TD Ameritrade and its manufacturer partner, Lenovo, confirmed their reasons for buying VDI products from Mr. Hendrickson beginning in October 2017: they had not heard from Razor and they knew Mr. Hendrickson's attentiveness.

## II. Conclusions of law

97. For a preliminary injunction, Razor must establish (1) "[it is] likely to succeed on the merits of [its] claims"; (2) "[it is] likely to suffer irreparable harm without relief"; (3) the balance of harms favors [Razor]; and, (4) relief is in the public interest."[19]

98. Razor did not adduce persuasive evidence it is likely to succeed in proving it had valid non-compete agreement with Mr. Hendrickson.

99. Razor did not adduce persuasive evidence to establish it is likely to succeed in proving the information held by Mr. Hendrickson concerning how TD Ameritrade prefers to be billed or treated as a customer is Razor's trade secret.

100. Razor did not demonstrate its harm in losing commissions from one customer is irreparable. Even if we assume Razor proved a trade secret, the trade secret is limited to how TD Ameritrade prefers to be treated. It would not apply to goodwill in the marketplace or other customers. The claim relates to approximately $4.2 Million in lost commissions.

101.    Razor does not meet the first two elements for injunctive relief.  It also cannot show the balance of the equities favors prohibiting the further work of Mr. Hendrickson and CE Tech outweighs a possible but largely undefined claim.

102.    Razor also does not show an injunction will serve the public interest given Pennsylvania's long standing scrutiny of non-compete agreements and Razor's lack of persuasive evidence Mr. Hendrickson's knowledge of a third party client's preferences and evidence those preferences are confidential to show Mr. Hendrickson misappropriated a trade secret.

## III.    Analysis

Our court of appeals instructs a "preliminary injunction is an extraordinary remedy granted in limited circumstances."[20]  For a preliminary injunction, Razor must establish (1) "[it is] likely to succeed on the merits of [its] claims"; (2) "[it is] likely to suffer irreparable harm without relief"; (3) the balance of harms favors [Razor]; and, (4) relief is in the public interest."[21]

### A.  Razor does not adduce persuasive evidence it is likely to succeed on the merits.

We first analyze whether Razor is likely to succeed on the merits of its breach of a non-compete agreement and its misappropriations of trade secrets claim.

### 1.  Breach of non-compete agreement.

Razor argues it limited Mr. Hendrickson's post-Razor business through two restrictive covenants: (1) the restrictive covenant Mr. Hendrickson allegedly signed as a condition of Razor hiring him; and, (2) Mr. Hendrickson's 2013 Compensation Plan.  To establish a contract between itself and Mr. Hendrickson, Razor must prove a meeting of minds as to the "essential terms" of the non-compete agreement.[22]

Pennsylvania law requires an enforceable non-compete restrictive covenant to (1) "relate to either a contract for the sale of goodwill or other subject property or to a contract for employment"; (2) "be supported by adequate consideration"; (3) "be reasonably limited in both time and territory."[23] Where the parties' discussions are more informal and they plan, but never execute, a formal contract "it is an essential element of the informal contract that the minds of the parties should meet upon all the terms, as well as the subject matter of the contract; and, if anything is left open for future consideration, the informal agreement cannot form the basis of a binding contract."[24]

Razor did not produce a copy of a non-compete signed by Mr. Hendrickson with any employer. We do not find Mr. Sucher's testimony credible he saw Mr. Hendrickson's signature on non-compete nor do we find Mr. Stillittano's testimony credible he and Mr. Hendrickson orally discussed terms of non-compete before Razor offered Mr. Hendrickson's employment. We find Mr. Hendrickson's testimony credible he did not sign a non-compete and told Mr. Sucher he would not sign a non-compete before accepting the employment.

Even if the parties had an oral non-compete agreement, there must be persuasive evidence the parties agreed on essential, definite terms. In *TES Franchising, LLC v. Dombach,* the employer alleged the employee agreed to an oral non-compete agreement but the employee testified, while they discussed a non-compete, he never signed or orally agreed to a non-compete.[25] The district court found the employer is "attempting to enforce an oral contract, the terms of which are unknown …" and denied the motion for preliminary injunction because the employer failed to establish the restrictions in the non-compete where "reasonably limited in duration and geographic context."[26]

Razor also argues Mr. Hendrickson agreed to a non-compete covenant by signing his 2013 Compensation Plan's Terms & Conditions.  The cover of the 2013 Compensation Plan's Terms & Conditions states "[t]his is not an employment contract; rather, it is a description of terms, policies and procedures associated with your incentive payment."[27] The Plan states "[b]y accepting any pay under this Compensation Plan, you are automatically accepting the Plan, agreeing to a full non-compete in your general territory and Razor Technology, LLC territory ...."[28]

Razor does not establish it is likely to succeed on the merits because it did not adduce persuasive evidence it had a non-compete agreement with Mr. Hendrickson.  Razor cannot produce a copy of a signed agreement.  Mr. Sucher's testimony he saw a signed copy of the agreement is not credible.  Mr. Stillittano's testimony he and Mr. Hendrickson generally discussed a non-compete does not create a contract because Mr. Stillittano is unable to recall the specific elements discussed and the existence of an oral contract requires a meeting of the minds on essential terms.  Razor does not establish the 2013 Compensation Plan can be interpreted as a non-compete because the document states on its face it is not a contract.

### 2.      Misappropriations of trade secrets.

Razor is not likely to succeed in proving the information held by Mr. Hendrickson concerning how TD Ameritrade prefers to be billed is a trade secret.[29]  To succeed on a misappropriation of a trade secret claim, Razor must adduce evidence: (1) "[] the information in fact constituted a trade secret; (2) [] it was of value to the employer and important in the conduct of [its] business; (3) [] the employer had the right to use and enjoyment of the secret; and, (4) [] the information was communicated to [Mr. Hendrickson] while employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose

it to others, or to make use of it himself, to the prejudice of [Razor].”[30]  Pennsylvania law defines a trade secret as “Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process” which has “independent economic value ... from not being generally known” and which is “[t]he subject of effects … to maintain its secrecy.”[31]

When determining whether information is a trade secret, our court of appeals instructs us to consider six relevant factors: (1) the extent to which the information is known outside of Razor’s business; (2) the extent to which the information is known to Razor’s other employees; (3) the extent of Razor’s measures “to guard the secrecy of the information”; (4) “the value of the information to competitors; (5) “the effort or money expended to develop the information”; and, (6) the ease or difficulty with which [the information] could be properly acquired or duplicated.”[32]

In *Select Medical*, the employer, an operator of healthcare facilities, moved to enjoin its former regional vice-president of facilities in twelve states from using its trade secrets.[33]  The employer identified the stolen trade secrets as being the knowledge of its current and future development projects, information about certain facilities’ business models, referral sources, financial and marketing information, its third party contracts, and its reorganization plans.[34]  The district court held while the employer “could prevail at trial on the issue of trade secrets, it has not shown this Court that it is likely to do so.”[35]  In its holding, the court found the evidence showed some of the alleged trade secrets were public knowledge and the employer did not present “persuasive evidence [] it took measures to guard the secrecy of the information or [] the information was in fact a secret from its competitors.”[36] The court found “the concept of a trade

secret does not include an employee's subject knowledge obtained while in the course of employment."[37]

Razor argues Mr. Hendrickson possesses detailed information about TD Ameritrade's needs, particularly Razor's and Mr. Hendrickson's knowledge of how TD Ameritrade required the purchase order number to be on invoices, the quotes to be placed on an Excel spreadsheet instead of a .PDF, and knew the proper shipping logistics and TD Ameritrade personnel to contact for deliveries. It claims this information is a trade secret. Razor argues Mr. Hendrickson learned these trade secrets while in its employ and then used his knowledge of these trade secrets to persuade TD Ameritrade to make purchases on the VDI project from CE Tech beginning in October 2017. Razor did not present persuasive evidence Razor's "perfection" of the process to properly service TD Ameritrade's orders is a trade secret and evidence it took measures to guard the confidentiality of the process. Razor's Mr. Gagne acknowledged the information came from TD Ameritrade and acknowledged other value-added resellers and vendors to TD Ameritrade may also know about these specifications.

Razor did not adduce persuasive evidence to establish it is likely to succeed in proving the information held by Mr. Hendrickson concerning how TD Ameritrade prefers to be billed is a trade secret.

### B. Razor does not establish irreparable harm.

Razor must make a "clear showing of immediate irreparable injury."[38] Razor's immediate, irreparable injury cannot be "purely economic," it must pose a potential harm "which cannot be redressed by a legal or equitable remedy following a trial."[39] If Razor's damages can be measured then the harm is not irreparable, irreparable harm is typically "loss of control of reputation, loss of trade, and loss of good will."[40]

Razor argues the damage to its client relationship with TD Ameritrade is irreparable harm. The evidence adduced at trial showed Razor values its damages at an approximate 10% sales commission on the $42 million in product TD Ameritrade purchased beginning in October 2017. Razor did not prove its potential harm from continued loss of TD Ameritrade's business cannot be measured at trial if Razor successfully proves its case. Razor also fails to show immediacy of injuries because it failed to specify specific harm it will likely suffer without an injunction and Mr. Gatea acknowledged Razor had its misgivings about its future relationship with TD Ameritrade even though the two continue to do some business together.

### C. The balance of the harms does not favor Razor.

Razor does not meet the first two elements for injunctive relief. It also cannot show the balance of the equities favors prohibiting the further work of Mr. Hendrickson and CE Tech outweighs a possible but largely undefined claim.

### D. Razor does not establish an injunction will serve the public interest.

Razor also does not show an injunction will serve the public interest given Pennsylvania's long standing scrutiny of non-compete agreements and Razor's lack of persuasive evidence Mr. Hendrickson's knowledge of a third party client's preferences and evidence those preferences are confidential to show Mr. Hendrickson misappropriated a trade secret.

## IV.

Razor did not adduce evidence warranting the extraordinary relief of enjoining its former employee for servicing TD Ameritrade or any other customer. Razor cannot define terms of a post-employment restriction on his ability to earn a living. Absent definite terms agreed by Mr. Hendrickson in exchange for consideration, we will not create post-employment restrictions.

Razor also did not adduce evidence of Mr. Hendrickson or CE Tech's use of a Razor trade secret. If anything, the trade secret may belong to TD Ameritrade and it does not assert improper use.

As Razor cannot meet the burden necessary for preliminary injunctive relief, we deny its motion in the accompanying Order.

---

[1] ECF Doc. No. 1, ¶ 9.

[2] Exhibit 1.

[3] Exhibit 4.

[4] Exhibit 2.

[5] ECF Doc. No. 24-1, ¶ 7.

[6] Exhibit 5.

[7] Exhibit 5.

[8] N.T. Cara Orton, Apr. 27, 2018, pp. 35:20-24; 57:1-18.

[9] *Id.*

[10] *Id.* pp. 50:15-52:21.

[11] N.T. Steven Patterson, Apr. 25, 2018, p. 43:3-14.

[12] *Id.* p. 43:10-23.

[13] *Id.* p. 39:2-18.

[14] *Id.* p. 53:12-25.

[15] *Id.*

[16] ECF Doc. No. 1.

[17] ECF Doc. No. 24 at 1-2.

[18] *Id.* at 2.

[19] *Id.* (citing *Ferring*, 765 F.3d at 210).

[20] *Issa v. School District of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citing *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014)).

[21] *Id.* (citing *Ferring*, 765 F.3d at 210).

[22] *See Meyer, Darragh, Bucklet, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016) (internal citations omitted) ("It is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages.")

[23] *Soft Pretzel Franchise Sys., Inc. v. Taralli, Inc.*, No. 13-3790, 2013 WL 5525015, at *7 (E.D. Pa. Oct. 4, 2013) (quoting *Piercing Pagoda v. Hoffner*, 351 A.2d 207, 210 (Pa. 1976)). Neither party cites a case where the court, applying Pennsylvania law, found an employee signed a restrictive covenant based on disputed testimony where no signed written copy existed.

[24] *Quandry Solutions, Inc. v. Verifone Inc.*, No. 07-97, 2009 WL 997041 at *9 (E.D. Pa. 2009).

[25] No. 10-17, 2010 WL 3946274, *17-18 (E.D. Pa. Oct. 7, 2010).

[26] *Id.*

[27] ECF Doc. No. 24-3 at 5.

[28] ECF Doc. No. 24-3 at 7.

[29] *See Tyson Metal Prod., Inc. v. McCann*, 546 A.2d 119, 121 (Pa. Super. Ct. 1988) (citing *Van Prod. Co. v. Gen. Welding and Fabricating Co.*, 213 A.2d 769 (Pa. 1965)) ("The starting point in every case of this sort is not whether there was a confidential relationship, but whether, in fact, there was a trade secret to be misappropriated.").

[30] *Select Medical Corp. v. Hardaway*, No. 05-3341, 2006 WL 859741, at *7 (E.D. Pa. March 24, 2006) (quoting *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1256 (3d Cir. 1985)).

[31] 12 Pa. C.S.A. § 5302.

[32] *Nova Chemicals, Inc. v. Sekisui Plastics Co., Ltd.*, 579 F.3d 319, 327 (3d Cir. 2009) (citing *SI Handling*, 753 F.2d at 1256).

[33] *Select Medical*, 2006 WL 859741, at *7.

[34] *Id.*

[35] *Id.* at *8.

[36] *Id.*

[37] *Id.*

[38] *Grant Heilman Photo., Inc. v. John Wiley & Sons. Inc.*, 864 F. Supp. 2d 316, 325 (E.D. Pa. 2012) (quoting *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011)).

[39] *Id.* (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)).

[40] *Id.* (quoting *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004)).